STATE OF NORTH CAROLINA v. NATHANIEL INGRAM

No. 4

(Filed 11 October 1972)

1. Criminal Law § 161— no assignments of error — error on face of record

  When the case on appeal contains no assignments of error, the judgment must be sustained, unless error appears on the face of the record.

2. Criminal Law § 161— first degree murder — no error on face of record

  Where the conflict between State's evidence and defendant's evidence was resolved by the jury in favor of the State, the charge

of the judge was a full and correct statement of the law, and the evidence was sufficient to withstand defendant's motion for nonsuit in that it tended to show that defendant killed his wife with a shotgun after threatening to do so and that he stated to officers that he had intentionally killed her, there was no prejudicial error which would entitle defendant to a new trial.

APPEAL by defendant from *Robert Martin, S.J.*, at the 6 December 1971 Special Session of MONTGOMERY.

By indictment, proper in form, the defendant was charged with the murder of Ester Little Ingram, his wife. He was found guilty of murder in the first degree with recommendation that the punishment be imprisonment for life. Sentence was imposed in accordance with the verdict.

The evidence for the State is to the following effect:

At 7:30 p.m. on 23 August 1971, Deputy Sheriffs Brady and Luther went, in response to a call, to the home of Lillie Mae Rush, the defendant's mother-in-law. Upon arrival they found the defendant and his wife involved in a fight outside the house. The defendant was chasing his wife with an unloaded shotgun in his hand and, upon overtaking her, struck her with the gun. The officers subdued him, took the gun from him, handcuffed him and carried him to jail. En route to the jail, without any interrogation by the officers, he said, "I'm going to kill her."

Upon arrival at the jail, the officers obtained from Magistrate Greene warrants charging the defendant with engaging in an affray and resisting arrest. The defendant's wife then arrived and swore out a warrant charging him with assault with a deadly weapon. At 9:30 p.m., the defendant was released on bond.

Shortly after 11:30 p.m., the defendant returned to the magistrate's office and said to the magistrate, "I have come to give myself up." The magistrate inquired, "What have you done this time?" He replied that he had shot his wife. Upon the magistrate's inquiry, "Is she dead?" He replied, "I hope so." The defendant, not under arrest, then took a seat in the magistrate's office.

Meanwhile, Officers Brady and Luther, in response to another call, had gone to the defendant's home, in the vicinity of that of his mother-in-law. There they found the body of

Ester Ingram, the defendant's wife. There was a large shotgun wound in her right chest, which, in the opinion of a medical expert witness, was the cause of her death. The officers found in the house a 12-gauge, bolt action shotgun with one spent shell in the chamber. The deceased held a screwdriver in her right hand. At about 10:30 p.m., the defendant had gone to the home of a neighbor who then had the defendant's shotgun in his possession, and had obtained the gun from the neighbor, who refused to let him have any shells for it.

After the body of Ester Little Ingram was removed by the coroner, Officers Brady and Luther went to the magistrate's office, arriving there about 20 minutes after the defendant. Finding the defendant there, Officer Brady asked him if he shot his wife. When the defendant replied that he did, Officer Brady told him he was under arrest for the murder of his wife and gave him the full Miranda warning. He then asked the defendant if anyone had searched him. The defendant thereupon took three unfired 12-gauge shotgun shells from his pocket and handed them to the officer. They were similar to the fired shell found in the gun. The defendant asked, "Is she dead?" Officer Brady replied, "Yes." The defendant then said, "Good, I meant to kill her." The defendant was not interrogated further by the officers.

The defendant testified in his own behalf to the following effect:

When he got home from work on 23 August 1971, his wife began quarreling with him. He left home, purchased a six-pack of beer and returned home. He and his stepson sat on the porch and drank the beer. His wife continued to quarrel and got a gun, which the defendant took from her and carried to his mother-in-law's house. At that time "they all" jumped on him and took the gun away from him. On former occasions his wife had shot him and stabbed him. He took the unloaded gun over to his mother-in-law's home to keep his wife from shooting him with it. The police drove up while he, his wife and his stepson were in the front yard of his mother-in-law's home scuffling for the gun. En route to the jail, he made no statement about killing his wife. After he was released on bond, he went to the home of his neighbor and got his gun, apparently a different gun from that taken from him at his mother-in-law's home.

State v. Ingram

Arriving at his home with his gun, he left it on the back porch and knocked on the door. His wife let him in and recommenced the quarrel. He got four shotgun shells from his gun belt in the bedroom and put them in his pocket. His wife told his stepson to go over to her mother's "to get the gun" and said she was going to kill the defendant. The stepson went to the grandmother's home, after advising the defendant that he would be dead if he were there when the stepson returned. The defendant then went out the back door, picked up his gun and put one shell in it for the purpose of defending himself.

The defendant then went around to the front porch of the house and thrust his hand through a hole in the door glass for the purpose of unlocking the door. His wife "snatched" his hand away and when he pushed the door open, she struck at him with something. She grabbed the gun barrel. He pulled the gun back and it fired.

The defendant did not intend to shoot his wife, but was going back into the house to get his clothes. After the shooting, he walked on through to the bedroom and threw the gun on the floor. He then left the house without calling an ambulance or a doctor, walked to a bootlegger's house, bought a pint of liquor and drank it. He then walked down to the magistrate's office. He did not intend to kill his wife and did not make any statement in the magistrate's office to that effect. He has been convicted previously of other offenses.

In rebuttal the State offered the testimony of the defendant's stepson to the effect that he was in the house when the defendant returned after being released under bond following the earlier quarrel. The defendant came into the house and changed his clothes. The stepson heard his mother tell the defendant to stop playing with the shotgun and the defendant reply, "I'm going to kill you." The stepson protested and the defendant stated he would kill both of them. The defendant then walked out of the back door and the stepson went to his grandmother's house, some 30 yards away, to tell his uncle that the defendant was "back with a shotgun." While at his grandmother's house, he heard a shotgun fire and rushed back to find his mother dead. His mother did not threaten the defendant. On former occasions his mother had shot and cut the defendant.

*Attorney General Morgan and Associate Attorney Conely for the State.*

*Charles H. Dorsett for defendant.*

LAKE, Justice.

**[1]** The defendant assigns no error and in his brief his counsel states that he has reviewed the record and is of the opinion that there were no errors committed during the course of the trial which prejudiced the rights of the defendant.

The appeal is, itself, an exception to the judgment. *State v. Darnell*, 266 N.C. 640, 146 S.E. 2d 800; *State v. Sloan*, 238 N.C. 672, 78 S.E. 2d 738; Strong, N.C. Index 2d, Criminal Law, § 161. "When the case on appeal contains no assignments of error, the judgment must be sustained, unless error appears on the face of the record." *State v. Higgs*, 270 N.C. 111, 153 S.E. 2d 781; *State v. Williams*, 268 N.C. 295, 150 S.E. 2d 447. No error appears on the face of the record proper in the present case.

**[2]** Notwithstanding the foregoing rule, due to the gravity of the offense charged and the imposition of the sentence to imprisonment for life, we have carefully examined the entire record. Like the defendant's counsel, we find therein no error which would entitle the defendant to a new trial.

The conflict between the defendant's testimony and the evidence of the State presented only a question of fact for the jury, which elected to believe the State's version of the shooting. The charge by the learned trial judge was a full and correct statement of the applicable principles of law. The evidence was obviously sufficient to withstand the defendant's motion for judgment of nonsuit.

The trial judge conducted numerous voir dire examinations before permitting the several witnesses for the State to testify concerning statements by the defendant while in the office of the magistrate. This evidence thereon fully supports the findings by the trial judge that: The defendant, while not under arrest, in the absence of any police officer, and while not under the influence of any alcoholic beverage or narcotic drug, voluntarily went to the magistrate's office and voluntarily stated that he had shot his wife and hoped she was dead; that, thereafter, though he was not under arrest or deprived

of his freedom of action in any way, the defendant remained in the office of the magistrate some 20 minutes until the arrival of Deputy Sheriffs Brady and Luther; that he was not in custody when, in response to an inquiry by Deputy Brady, he told the officers he shot his wife; and that his subsequent statement that he intended to kill her was not made in response to any interrogation by the officers.

The defendant's statement, while on the way to jail following the first episode, that he was going to kill his wife was also voluntary and was made without any question being directed to him by the officers.

No error.